James A. Bloom
Todd M. Schneider
**SCHNEIDER WALLCE
COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Fax: (415) 421-7105
E-Mail: jbloom@schneiderwallace.com
        tschneider@schneiderwallace.com

Paul M. Secunda*
* admitted *pro hac vice*
**WALCHESKE & LUZI, LLC**
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: psecunda@walcheskeluzi.com

*Counsel for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| MICHAEL S. SCHUSTER and JUAN C. DEL BARCO, individually, and as representatives of a Class of Participants and Beneficiaries of the Swinerton 401(k) and Savings Plan, <br><br> Plaintiffs, <br><br> v. <br><br> SWINERTON INCORPORATED, BOARD OF DIRECTORS OF SWINERTON INCORPORATED, and SWINERTON 401(K) SAVINGS COMMITTEE <br><br> Defendants. | Case No: 3:24-cv-04970-JSC <br><br><br> **CLASS ACTION AMENDED COMPLAINT FOR CLAIMS UNDER ERISA, 29 U.S.C., § 1132(a)(2)** |

COMES NOW Plaintiffs, Michael S. Schuster and Juan C. Del Barco, individually and as representatives of a Class of Participants and Beneficiaries of the Swinerton 401(k) and Savings Plan (the "Plan"), by and through their counsel, WALCHESKE & LUZI, LLC, and SCHNEIDER WALLCE COTTRELL KONECKY LLP, as and for a claim against Defendants, alleges and asserts to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## **INTRODUCTION**

1. Defendants, Swinerton Incorporated ("Swinerton"), the Board of Directors of Swinerton Incorporated ("Board"), and the Swinerton 401(k) and Savings Committee ("Plan Committee") (collectively "Defendants"), are fiduciaries under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* as they exercise discretionary authority or discretionary control over the 401(k) defined contribution retirement plan – known as the Swinerton 401(k) and Savings Plan (the "Plan" or "Swinerton Plan") – that it sponsors and provides to its employees.

2. During the putative Class Period (August 9, 2018, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative (RKA)] fees," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739-740 (2022), and by failing to remove their high-cost recordkeepers, John Hancock Retirement Plan Services ("John Hancock") and Principal Life Insurance Company ("Principal").

3. From the beginning of the Class Period on August 9, 2018 until January 31, 2019, the sole Plan recordkeeper was John Hancock.

4. From February 1, 2019 to present, the sole Plan recordkeeper has been Principal.

5. Plaintiffs are "participants" of the Plan under ERISA Section 3(7), 29 U.S.C. § 1002(7).

6. The Plan is a Section 401(k) "defined contribution" retirement plan under 29 U.S.C. § 1002(34). In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, *less expenses*." *Tibble v. Edison Int'l,* 575 U.S. 523, 525 (2015) (emphasis added).

7. Swinerton and its Board are the Plan Sponsors, while the Plan Committee is the Plan Administrator of the Plan.

8. Plaintiffs allege two ERISA violations against Defendants: a violation of the duty of prudence against Defendants under 29 U.S.C. § 1104(a)(1)(B) for charging Plan participants excessive Total RKA fees; and a claim against Defendants for failure to monitor those on the Plan Committee responsible for Plan administration with regard to Plan Total RKA fees.

9. More specifically, Count I alleges a breach of the fiduciary duty of prudence by Defendants for incurring unreasonable Total RKA and *paying over a 188% premium* per-participant for Total RKA fees for the Plan to the two Plan recordkeepers, John Hancock and Principal, during the Class Period. Defendants should have substantially lowered its Total RKA fees by soliciting bids from competing providers and using its massive size and correspondent bargaining power to negotiate for fee rebates, but it did not do so, or did so ineffectively, during the Class Period.

10. Count II alleges a breach of fiduciary duty of prudence by Defendants for failing to monitor those individuals on the Plan Committee responsible for paying unreasonable Total RKA fees.

11. Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

12. The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise

prudence in selecting investments at the outset." *Tibble v. Edison Int'l*, 575 U.S. 525, 529 (2015). This continuing duty to monitor is a subset of the duty of prudence, *id.* at 529–30, and requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*"); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (discussing a fiduciary's duty to keep plan expenses under control).

13.     Plan fiduciaries have a continuing duty to monitor their Total RKA fees to make sure that they are not excessive with respect to the services received.

14.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Total RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

15.     "To state a claim for breach of fiduciary duty, a complaint does not need to contain factual allegations that refer directly to the fiduciary's knowledge, methods, or investigations at the relevant times." *See Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1070 (N.D. Cal. 2017). After all, "the circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995).

16.     The unreasonable Total RKA fees inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Total RKA services, given their level and quality, were improvident. The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 63 F.4th at 628.

17.     These breaches of fiduciary duty caused Plaintiffs and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees.

18. To remedy these fiduciary breaches, Plaintiffs bring this action in a representative capacity on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

20. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

21. Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

22. In conformity with 29 U.S.C. § 1132(h), Plaintiffs served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

23. Plaintiff Michael S. Schuster is a resident of the State of Oregon and currently resides in Milwaukie, Oregon. At all relevant times and throughout the Class Period, Plaintiff Schuster was participant in the Plan under 29 U.S.C. § 1002(7).

24. Plaintiff Schuster was employed by Swinerton from 1988-1991 and 2011-2012, as Director of Operations at the Portland, Oregon facility.

25. During the Class Period, Plaintiff Schuster invested in the Swinerton Stock Fund and, as part of a managed account program, was invested in the stable value option, iShares US Aggr. Bond Index, Baird Aggr. Bond Index, Institutional Index Fund. Principal Real Estate Fund,

Mid-Cap Growth Fund, and EuroPacific Growth Fund R3. Plaintiff Schuster rolled out of the Plan in 2019.

26. Plaintiff Juan C. Del Barco is a resident of the State of Arizona and currently resides in Maricopa, Arizona. At all relevant times and throughout the Class Period, Plaintiff Del Barco has been participant in the Plan under 29 U.S.C. § 1002(7).

27. Plaintiff Del Barco was employed by Swinerton from 2017-2022, as a Safety Manager in the Los Angeles area.

28. During the Class Period, Plaintiff Del Barco invested in the Baird Aggregate Bond Index Fund, the FlexPath Aggressive 2025 and 2035 target date funds, Vanguard Institutional Index Fund, BlackRock Advantage Small Cap Core K Fund, T. Rowe Price Mid-Cap Growth I Fund, American Funds EuroPacific Growth R6 Fund, and Swinerton Stock Fund. Plaintiff Del Barco is a current participant in the Plan.

29. Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their own Plan account through paying excessive Total RKA fees to the Plan recordkeepers, John Hancock and Principal, during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining John Hancock and Principal as its recordkeepers, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and Class.

30. Having established Article III standing, Plaintiffs seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for all of the losses suffered by the Plan pursuant to 29 U.S.C. § 1109(a), ERISA § 409(a), including relief that sweeps beyond the losses in Plaintiffs' account in the Plan.

31. The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Total RKA fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

32. Having never managed a massive 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

33. Defendant Swinerton Incorporated ("Swinerton") is a commercial construction company that provides services in the United States for commercial office, retail, multi-family residential, hospitality, healthcare, education, energy, and the entertainment sectors. Swinerton has nearly 5,000 employees and its principal headquarters are located at 260 Townsend Street, San Francisco, California, 94107, while it lists its Benefits offices at 2001 Clayton Road, 7th Floor, Concord, California, 94520. In this Complaint, "Swinerton" refers to the named Defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

34. Swinerton acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Swinerton and its Board appointed other Plan fiduciaries on the Plan Committee to administer and manage the Plan and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Swinerton and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

35. The Plan is administered by the Plan Committee. As the Plan Administrators, the Plan Committee and its members are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Plan Committee has the authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

36. In 2023, the Plan had $747,596,913 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had more bargaining power regarding Plan fees and expenses than most other 401(k) plan in the United States. Defendants, however, did not regularly monitor John Hancock and Principal to ensure that they remained the prudent and objectively reasonable choices to provide Total RKA services, as illustrated by not reducing its Total RKA fees sufficiently.

37. With 3,812 participants with account balances in 2023, the Plan had more participants than 99.66% of the defined contribution plans in the United States that filed 5500

forms for the 2023 Plan year. Similarly, with $747,596,913 in assets in 2023, the Plan had more assets than 99.89% of the defined contribution plans in the United States that filed 5500 forms for the 2023 Plan year.

**RECORDKEEPING AND ADMINISTRATIVE ("RKA") SERVICES AND FEES**

38. Employers must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be prudent choices.

39. Defined contribution plan fiduciaries of 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed RKA service offerings that can meet all the needs of massive retirement plans with a prudent and materially similar level and caliber of services. John Hancock and Principal are two such recordkeepers.

40. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to defined contribution plans like the Swinerton Plan.

41. All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide materially similar RKA services to maintain the same profit margin rate.

42. "Total RKA" may include some combination of some or all of the following:

    a. Recordkeeping;

    b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

    c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e. Maintenance of an employer stock fund;

f. Plan document services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

h. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules;

i. Various Plan professional services (accounting, audit, appraisal, and legal fees)

j. Plan-level investment advising, consulting, and management;

k. Usage fees (for loan fees, hardship withdrawal fees, QDROs, etc.); and

l. Trustee/custodian services.

43. These recordkeeping services are fungible and commoditized, and are standard services provided by all major recordkeepers for ERISA 401(k) plans.

44. This does mean all plans have identical services, only they are provided the same set of services, and can pick and choose among them.

45. According to the Swinerton Notes to Financial Statements attached to the Swinerton 401(k) and Savings Plan 5500 Form for 2022, "[p]ursuant to the Plan document, all expenses of administering the Plan and trust shall be paid from trust assets . . . . Expenses paid by the Plan represent investment advisor fees, hardship withdrawal fees, Plan administrative fees, loan origination fees, audit fees, and appraisal fees."

46. These services listed in the Plan Notes to Financial Services are basic Total RKA services and establish that Swinerton had the *same set of services* (not identical) as all the comparator plans discussed in more detail below.

47. In other words, there is nothing in these Notes to Financial Statements to suggest that there is anything exceptional, unusual, or customized, about the Total RKA services provided to the Swinerton Plan participants by John Hancock or Principal.

48. This action focuses on ***Plan RKA fees paid to John Hancock or Principal*** and related to recordkeeping, including those services received by Principal: contract administrator fees (code 13) and participant loan processing (code 37), as well as those fees paid to Principal: undisclosed direct payments from the plan (code 50) and recordkeeping fees (code 64), as outlined in Schedule C of the 2023 Department of Labor ("DOL") 5500 Form filed by the Swinerton Plan fiduciaries on October 15, 2024.

49. When John Hancock was the Plan recordkeeper, the associated service codes indicate John Hancock received the following services: recordkeeping and information management (code 15), custody fees (codes 18 and 19), participant loan processing (code 37), participant communications (code 38). John Hancock received the following fees: investment management fees paid indirectly by plan (code 52), redemption fees (code 57), sub-transfer agency fees (code 60), float revenue (code 62), and recordkeeping fees (code 64).

50. Importantly, the Plan paid separate amounts to other Plan service providers when both John Hancock and Principal were the Plan recordkeeper, including to: (1) NFP Retirement for investment advising and management; (2) HLB Human Capital Management for consulting (general); (3) Moss Adams for accounting and auditing services; and (4) Chartwell Financial Advisory for appraisal services.

51. Although comparator plans, like the Weil, Gotshal & Manges Section 401(K) Savings and Investment Plan, Genesco Salary Deferral Plan, IBERIABANK Corporation Retirement Savings Plan, Under Armour 401(K) Plan, Sound Physicians 401(K) Plan, Ellucian Retirement Plan, AARP Employees 401K Plan, Alaska Airlines Inc. AlaskaSaver Plan, Stop & Shop Supermarket Retirement Savings Plan, and West Pharmaceutical Services, Inc. 401(K) Plan, all use different service codes on their 5500 Forms than the Swinerton Plan, as the Third Circuit recently observed in *Mator v. Wesco Distrib, Inc.*, "the different service codes do not undermine

the [plan] comparisons because they apparently overlap." All of the plans list either 'Recordkeeping fees,' 'Recordkeeping and information management (computing, tabulating, data processing),' or both." *See id.*, 102 F.4th 172, 186 (3d Cir. 2024).

52. The following charts shows the same is true with regard to the Swinerton Plan's comparator plans *for 2018* with regard to both asset size and participant size. Each list recordkeeping fees (Code 64), "Recordkeeping and information management (computing, tabulating, data processing) (Code 15), or both, just as in *Mator*:

| Plan | Service / Compensation Codes |
|---|---|
| Weil, Gotshal & Manges Section 401(K) Savings and Investment Plan | 12, 15, 28, 37, 38, 50, 54, 59, 61, 62, 63, 64, 65 |
| Genesco Salary Deferral Plan | 64 |
| IBERIABANK Corporation Retirement Savings Plan | 13, 15, 37, 50, 64 |
| Under Armour 401(K) Plan | 15, 21, 25, 28, 33, 37, 38, 49, 50, 52, 55, 57, 59, 62, 64, 65 |
| Sound Physicians 401(K) Plan | 15, 26, 27, 37, 50, 51 |

53. The following charts shows the same is true with regard to the Swinerton Plan's comparator plans *for 2021* with regard to both asset size and participant size. Each list recordkeeping fees (Code 64), "Recordkeeping and information management (computing, tabulating, data processing) (Code 15), or both, just as in *Mator*:

| Plan | Service / Compensation Codes |
|---|---|
| Ellucian Retirement Plan | 15, 16, 25, 37, 52, 99 |
| AARP Employees 401K Plan | 15, 37, 49 |
| Alaska Airlines Inc. AlaskaSaver Plan | 15, 25, 33, 37, 52, 99 |
| Stop & Shop Supermarket Retirement Savings Plan | 37, 50, 64, 65, 71 |
| West Pharmaceutical Services, Inc. 401(K) Plan | 15, 25, 37, 52, 99 |

54. Consequently, the RKA analysis focused on recordkeeping (Codes 15 and 64) provided by John Hancock and Principal is an appropriate method to make an apples-to-apples comparison, and then infer a flawed fiduciary process from the disparity in RKA fees.

55. In short, "[a]t this stage, the record does not reveal the codes' precise meanings, nor whether all plans define the codes consistently. But given that all the plans received some portion

of an overlapping constellation of recordkeeping services, the comparisons help nudge the [plaintiffs'] claims across the line from possible to plausible." *Mator*, 102 F.4th at 186.

56. The Swinerton Plan provided participants all the commoditized and fungible RKA services provided to all other very large 401(k) plan participants. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by John Hancock and Principal.

57. Any differences in these RKA services are immaterial to the price quoted by recordkeepers for such services.

58. Yet some of the Notes to Financial Statements are inconsistent with numbers reported elsewhere in the Plan 5500 Forms, as the following chart highlights:

### Schedule H, Part II, 1 Administrative Expenses

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Professional Fees | $81,900 | $13,904 | $0 | $0 | $0 | $0 |
| Contract Administrator Fees | $342,767 | $385,194 | $481,027 | $617,847 | $542,543 | $633,463 |
| Investment Advisory and Management Fees | $47,625 | $79,280 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Administrative Expenses** | **$472,292** | **$478,378** | **$481,027** | **$617,847** | **$542,543** | **$633,463** |

### Schedule C, Part I, 2 Service Providers Receiving Direct or Indirect Compensation

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| JOHN HANCOCK RETIREMENT PLAN SRVCS | $342,767 | $16,819 |  |  |  |  |
| PRINCIPAL LIFE INSURANCE COMPANY |  | $424,759 | $481,207 | $667,603 | $591,951 | $633,463 |
| **Total** | **$342,767** | **$441,578** | **$481,207** | **$667,603** | **$591,951** | **$633,463** |
| Financial Statement Notes: | $201,970 | $478,378 | $438,079 | $507,317 | $542,543 | unknown |
| Statement of Changes in Net Assets Available | $201,970 | $478,378 | $425,283 | $507,317 | $542,543 | unknown |

59. This Complaint therefore reviewed the Financial Statement Notes but did not take into account these contradictory numbers in the Financial Statement Notices in the Total RKA fee calculations below.

60. Given the fungibility and commoditization of these Total RKA services for massive plans like the Swinerton Plan, failing to adjust fee arrangements, solicit bids, or negotiate for

rebates with existing recordkeepers, all violate a fiduciary's duty of prudence under ERISA. *See Hughes II*, 63 F.4th at 625-626.

61. Based on Plan 5500 Forms, John Hancock and Principal from 2018-2023 in fact charged Plaintiff and Class Members $124 annually on average deducted quarterly per participant for Total RKA. Comparatively-sized plans have paid $43 annually on average deducted quarterly per participant for Total RKA.

62. Since well before 2018, industry experts have maintained that for massive retirement plans like the Swinerton Plan, prudent fiduciaries treat Total RKA services as a commodity with little variation in price.

63. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

64. Because RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for massive plans like the Swinerton Plan.

65. Given the large size of the Swinerton Plan, the same price paid by the Swinerton Plan for Total RKA over the Class Period, and the trend of price compression for Total RKA over the last six years, Plaintiff can infer that Defendants did not engage in any competitive solicitation for RKA services, or only ineffective ones, breaching ther fiduciary duties of prudence.

66. The same exact methodology was utilized for calculating the Total RKA for both the Swinerton Plan and for the five comparative plans:

     a. taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

b. reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets;

c. reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

d. Cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

e. utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

f. reviewing the notes of the Audited Financial Statement attachment to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g. reviewing the results for reasonableness and make revisions as appropriate based on Plaintiff's non-testifying experts' experience in evaluating plans with different recordkeepers.

67. Because the Total RKA offerings are fungible among all recordkeepers who provide services to massive plans, like the Swinerton plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the recordkeeper's "revenue requirement" is on a per participant basis for providing the Total RKA services.

68. This approach is validated by the structure of the request for proposals (RFPs) sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

69. Fidelity, the largest 401k recordkeeper in the country, has in fact conceded that the Total RKA services that it provides to other massive plans are commodified, including the plan services provided to its own employees.

70. As part of stipulated facts in a previous case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the

Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present)*." *See Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

71. The investment options selected by plan fiduciaries often have a portion of the Total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

72. Recordkeepers often collect a portion of the Total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

73. Revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment.

74. Because revenue sharing arrangements provide asset-based compensation for the recordkeeper, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided.

75. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee.

76. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to have their high-priced funds included as plan investment options.

77. According to the Swinerton Notes to Financial Statements attached to the Swinerton 401(k) and Savings Plan 5500 Form for 2022, the Swinerton Plan paid both direct and

indirect Total RKA fees throughout the Class Period to John Hancock and Principal or to other Plan service providers.

## ERISA FIDUCIARY STANDARDS FOR SELECTING AND MONITORING RECORDKEEPERS

78. Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan every three to five years. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited May 1, 2024) ("Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the *number of plan participants and the amount of plan assets as of a specified date*.") (emphasis added); CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years.").

79. Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of Total RKA fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

80. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.

81. Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide a materially similar level and qualities of services for a more competitive reasonable fee if necessary.

82. An internal benchmarking survey from CapTrust, Fiduciary Decisions/Benchmarks, or similar company, is alone inadequate to determine a reasonable Total RKA fee. Such benchmarking surveys skew to higher "average prices," that favor inflated Total RKA fees. To receive a "reasonable" Total RKA fee in the prevailing market, investment consultants routinely advise plan fiduciaries to engage in solicitations of competitive RKA bids.

83. Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA fees. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

84. First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

85. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

86. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

87. Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 63 F.4th at 625-626.

## SWINERTON PLAN PAID UNREASONABLE TOTAL RKA FEES TO JOHN HANCOCK AND PRINCIPAL DURING THE CLASS PERIOD

88. A plan fiduciary must continuously monitor its Total RKA fees by regularly conducting an independent evaluation of those fees to ensure they are reasonable and remove recordkeepers if those fees become unreasonable. *See Hughes*, 142 S. Ct. at 742.

89. During the Class Period, Defendants failed to monitor the Plan's Total RK&A fees paid to John Hancock and Principal and to other Plan service providers, thereby causing Plaintiffs, and Plan participants, to pay and continue to pay excessive and unreasonable fees for Total RKA.

90. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, or did so ineffectively, given the unreasonable Total RKA fees paid during the Class Period.

91. As set forth in the table below, from the years 2018 through 2023, based upon information provided in 5500 Forms filed with the Department of Labor, the Plan paid an effective average annual Total RKA fee of $124 annually per participant, while a reasonable rate for materially similar Total RKA fungible services for a plan the size of Swinerton should have been $43 annually per participant.

92. The *Swinerton Plan paid almost three times or more than necessary* for Total RKA from 2018 through 2023 as compared to similarly-sized comparative plans receiving similar fungible and commoditized Plan services as the following chart illustrates:

### Total Recordkeeping and Administration (Total RKA) Fees

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | *Average* |
|---|---|---|---|---|---|---|---|
| Participants | 3,089 | 3,403 | 4,230 | 3,912 | 3,595 | 3,812 | *3,674* |
| Est. Total RKA Fees | $342,767 | $441,578 | $367,832 | $566,853 | $491,701 | $522,748 | *$455,580* |
| Est. Total RKA Per Participant | $111 | $130 | $87 | $145 | $137 | $137 | *$124* |
| Reliable Est. of Reasonable Total RKA Fees | $132,827 | $146,329 | $181,890 | $164,304 | $150,990 | $160,104 | *$156,074* |
| Reliable Est. of Reasonable Total RKA Fees Per PP | $43 | $43 | $43 | $42 | $42 | $42 | *$42* |

93. For 2018, the $342,767 number for Est. Total RKA fees is based on two entries in Form 5500 as reported by the plan: (a) direct compensation to John Hancock as reported by the plan in Schedule C, Part I, Item 2 – Information on Other Service Providers Receiving Direct or

Indirect Compensation; and (b) $342,767 is the exact same amount that is also reported by the plan on Schedule H, Part II, i(2) "Contract Administrator fees."

94. For 2019, the $441,578 number for Est. Total RKA fees is based on the total amount of direct compensation paid to John Hancock and Principal Life Insurance Company as the plan had both recordkeepers during this year. This amount instead was utilized rather than $478,378 as reported in the 2019 Financial Statement and accompanying notes as this larger number may include services not part of this Total RKA claim.

95. For 2020, the $367,832 number for Est. Total RKA fees is based on $481,207 paid to Principal Life Insurance Company and subtracting $113,375 of indirect compensation reported for other service providers on the 2020 55000 Form Schedule C, assuming that $481,207 included compensation that was in turn paid out to other service providers as indirect compensation.

96. For 2021, the $566,853 number for Est. Total RKA fees is based on $667,603 of direct compensation paid to Principal Life Insurance Company and subtracting $100,750 of indirect compensation reported for other service providers on the 2021 55000 Form Schedule C.

97. For 2022, the $491,701 number for Est. Total RKA fees is based on $591,951 of direct compensation paid to Principal Life Insurance Company and subtracting $100,250 of indirect compensation reported for other service providers on the 2022 55000 Form Schedule C.

98. For 2023, the $522,748 number for Est. Total RKA fees is based on $633,463 of direct compensation paid to Principal Life Insurance Company and subtracting $110,715 of indirect compensation reported for other service providers on the 2023 55000 Form Schedule C.

99. The table below illustrates the annual Total RKA fees paid by other comparable plans of similar size, receiving a materially similar level and quality of Total RKA fungible services from 2018:

### Comparable Plans' Total RKA Fees Based on Publicly-Available Information - Form 5500

(Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available)

| Plan | Participants | Assets | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|---|
| Weil, Gotshal & Manges Section 401(K) Savings and Investment Plan | 2,564 | $469,229,171 | $146,518 | $57 | Transamerica |
| Genesco Salary Deferral Plan | 2,695 | $152,254,940 | $138,207 | $51 | Great-West |
| **Swinerton Plan** | **3,089** | **$313,540,263** | **$342,767** | **$111** | **John Hancock/Principal** |
| IBERIABANK Corporation Retirement Savings Plan | 3,193 | $150,049,361 | $127,723 | $40 | Prudential |
| Under Armour 401(K) Plan | 4,485 | $179,198,512 | $89,400 | $20 | T. Rowe Price |
| Sound Physicians 401(K) Plan | 4,970 | $218,520,712 | $161,063 | $32 | USICG |



100. The table below illustrates the annual Total RKA fees paid by other comparable plans of similar size, receiving materially similar level and quality of Total RKA services in 2021:

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2021 Form 5500 information or the most recent Form 5500 if 2021 is not available)

| Plan | Participants | Assets | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|---|
| Ellucian Retirement Plan | 3,208 | 635,664,530 | $156,749 | $49 | Vanguard |
| AARP Employees 401K Plan | 3,499 | 889,874,231 | $147,357 | $42 | T. Rowe Price |
| Alaska Airlines Inc. AlaskaSaver Plan | 3,867 | 688,522,635 | $174,317 | $45 | Vanguard |
| **Swinerton Plan 2021 Fee** | **3,912** | **$761,731,091** | **$566,853** | **$145** | **John Hancock/Principal** |
| Stop & Shop Supermarket Retirement Savings Plan | 4,023 | 935,648,024 | $156,415 | $39 | Fidelity |
| West Pharmaceutical Services, Inc. 401(K) Plan | 4,959 | 514,861,682 | $184,439 | $37 | Vanguard |

Swinerton Plan Total RKA Fee Comparison 2021, 2022 and 2023

101. The trend lines in the graphs above represents an effective per participant Total RKA fee rate for a given number of participants around which a plan fiduciary would expect to obtain had the plan fiduciary followed the standard of care to ensure the Plan paid only reasonable fees for materially similar Total RKA services.

102. The graphs use three year periods of time (2018-2020 and 2021-2023) because the fee offered by these recordkeepers in 2018 or 2021 would have been good for three years, as is common practice for Plan recordkeeping RFPs.

103. The comparable plans identified above are "meaningful benchmarks" that can support an inference that the Plan's fiduciaries did not follow a prudent process to ensure the Plan paid only reasonable fees for materially similar Total RKA fungible services.

104. Additionally, the Total RKA fees paid by each of these comparable plans provides evidence that the Plan paid excessive fees because there are no Total RKA services offered by any recordkeeper that would warrant or reasonably explain the disparity between the Total RKA fees

paid by the Plan and the Total RKA fees that other comparable plans received for the materially similarly Total RKA fungible services during the Class Period.

105. To determine the Total RKA fees that other comparable plans are paying, Plaintiffs considered both the direct and indirect compensation collected by recordkeepers as disclosed on publicly available Form 5500s and on participant fee disclosures, where available.

106. The Plan's Total RKA fee rate of $111 for 2018, $145 for 2021, as well as the Total average RKA fee rate for all other years within the Class Period ($124), is compared above to the Total RKA fee rates of other comparable plans in price points (good for three years) in 2018 and 2021.

107. The Plan's Total RKA fee rate range of $87/pp to $145/pp can be compared to the much lower Total RKA fee rate of other comparable plans.

108. Prior to the Class Period, the fees recordkeepers were willing to accept for RKA services had materially stabilized such that fees the recordkeepers were accepting in 2018 for RKA services were consistent with the fees recordkeepers would accept from 2018 to 2020, and that fees the recordkeepers were accepting in 2021 for RKA services were consistent with the fees recordkeepers would accept from 2021 to 2023.

109. To ensure meaningful and apples-to-apples comparisons, Plaintiffs utilized the same methodology to compare the fees of the Swinerton Plan with the fees of other similarly situated and meaningfully comparable plans.

110. Each of the meaningfully comparable plans identified below is among the closest 22/100th of 1% (0.22%) of all the defined contribution plans covered by ERISA by participant size.

111. Approximately 657,265 401(k) plans existed in 2018 and only 1,470 plans had between 2,443 and 3,890 participants with a balance greater than zero at year-end.

112. 655,795 plans or 99.78% of all plans have either less than 2,443 or more than 3,890 participants.

113. 401(k) plans containing between 2,443 and 3,890 participants are among the most meaningful and appropriate to use as similarly situated comparable plans and are superior to the remaining 99.78% of all the defined contribution plans governed by ERISA in 2018.

114. The Total RKA services received by these comparator plans were materially similar to the Total RKA services received by the Swinerton Plan in the form of recordkeeping, trustee, loan processing, hardship distribution, and other administrative fees, based on the highly similar nature of such services in the marketplace and a comparison of the participant fee disclosures of the comparator plans to the services received by the Swinerton Plan.

115. Although some of the comparators utilize different service or compensation codes for the services received on the 5500 Form, as illustrated above, because Total RKA services and fees for very large plans like the Swinerton Plan are fungible and commoditized, any differences between the plans in these codes are immaterial from a pricing perspective.

116. Based on the Swinerton Plan's features, the commoditized and fungible nature of the Total RKA services provided by the Swinerton Plan's recordkeepers, the number of participants in the Plans (approximately 3,800), and the recordkeeping market, $42 was the reasonable per participant fee.

117. The Total RKA fees paid by the Plan to John Hancock and Principal during the Class Period were excessive relative to the Total RKA services rendered given the commoditized and fungible nature of Total RKA fees for massive plans like the Swinerton Plan.

118. From the years 2018 through 2023, and based upon information derived from the Plan 5500 Forms, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $455,580 per year in Total RKA fees, which equated to an effective average of approximately $124 per participant per year.

119. A hypothetical prudent plan fiduciary would not agree to pay over *a 192% premium* for what they could otherwise pay for the materially similar level and quality of Total RKA services.

120. From the years 2018 through 2023, and based upon information derived from the Plan 5500 Forms, the Plan additionally cost its participants on average approximately $299,506 per year in additional recordkeeping fees, which equates to on average approximately $82 per participant per year.

121. From the years 2018 to 2023, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially similar level and quality of fungible services, the Plan actually cost its participants a total minimum amount of approximately **$1,797,035** in unreasonable and excessive Total RKA fees.

122. From the years 2018 to 2023, based upon information derived from the Plan 5500 Forms, because Defendants did not act prudently, and as compared to other plans of similar sizes and with a materially similar level and quality of fungible services, the Swinerton Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of **$2,356,140** in Total RKA fees.

123. Defendants failed to take advantage of the Plan's large size to timely negotiate lower fees or rebates from its existing recordkeepers, John Hancock and Principal, and other Plan service providers.

124. During February 2019, Swinerton successfully lowered the Plan's Total RKA fees when moving from John Hancock to Principal (even though lower RKA fees were available on the recordkeeper market at that time), which establishes that Swinerton's Total RKA fees were unreasonably high from at least August 2018 to February 2019, and that means that lower Total RKA fees were available to Swinerton Plan fiduciaries.

125. It can be plausibly inferred from the unreasonably high fees it paid for Total RKA services during the Class Period that Defendants did not conduct an effective or competitive solicitation of bids for Total RKA services, and failed to use the Plan's massive size to negotiate rebates from John Hancock and Principal.

126. Plaintiffs and Class Members paid all of these excessive Total RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

127. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Total RKA fees than they should have been and/or by failing to take effective remedial actions, Defendants breached their fiduciary duty of prudence to Plaintiffs and to other Plan participants, causing millions of dollars of harm to Plaintiffs' and Class Member's retirement accounts.

## CLASS ACTION ALLEGATIONS

128. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan in a representative capacity to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

129. In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Swinerton 401(k) and Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning August 9, 2018, and running through the date of judgment.

130. The Class includes over 3,800 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

131. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owes fiduciary duties to the Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

132. Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs and the other class members were participants during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

133. Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are or were participants in the Plan during the Class period, have no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

134. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

135. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

136. Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

137. The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plan in this case fall outside the scope of any exhaustion language in the Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

138. Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

139. Any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

### FIRST CLAIM FOR RELIEF
**Breach of Duty of Prudence Under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against**
**Defendant Plan Committee – Total RKA Fees)**

140. Plaintiffs restate the above allegations as if fully set forth herein.

141. Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

142. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in its administration of the Plan.

143. Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting a recordkeeper and Plan service providers that charge reasonable Total RKA fees.

144. During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: ensure that the Plan's Total RKA fees were reasonable; defray reasonable

expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

145. During the Class Period, Defendant Plan Committee breached its fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's Total RKA fees were reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

146. During the Class Period, Defendant Plan Committee further had a continuing duty to regularly monitor and evaluate the Plan's recordkeepers, John Hancock and Principal, and other Plan service providers, to make sure they were providing the Total RKA services at reasonable cost, given the highly competitive, commodified and fungible market surrounding recordkeeping and the enormous bargaining power the Plan had to negotiate the best fees, and remove Principal for another recordkeeper who provided RKA Total services at objectively reasonable fee levels.

147. During the Class Period, Defendant Plan Committee breached its duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

148. Defendant Plan Committee failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

149. As a result of Defendant Plan Committee's breach of its fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses.

150. Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Swinerton Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits

resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Plan Committee is subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other**
**Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class,**
**Against Defendants Company and Board – Total RKA Fees)**

151. Plaintiffs restate the above allegations as if fully set forth herein.

152. Defendants Company and Board had the authority to appoint and remove members or individuals on the Plan Committee responsible for Plan Total RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

153. In light of this authority, Defendants Company and Board had a duty to monitor those individuals on the Plan Committee responsible for Plan Total RKA fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

154. Defendants Company and Board had a duty to ensure that the individuals on the Plan Committee responsible for Plan Total RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's Total RKA fees; and reported regularly to Defendants Company and Board.

155. The unreasonable Total RKA fees paid by the Plan inferentially establish that Defendants Company and Board breached their duty to monitor by, among other things:

    a. Failing to monitor and evaluate the performance of individuals on the Plan Committee responsible for Plan Total RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonable Total RKA expenses;

    b. Failing to monitor the process by which the Plan's recordkeepers, John Hancock and Principal, and other Plan service providers, were

evaluated, and failing to investigate the availability of more reasonably-priced recordkeepers and other service providers; and

 c. Failing to remove individuals on the Plan Committee responsible for Plan Total RKA fees whose performance was inadequate in that these individuals continued to pay the same Total RKA fees over numerous years even though solicitation of competitive bids would have shown that maintaining Principal as the recordkeeper and other Plan service providers at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiffs' and other Plan participants' retirement savings.

156. As the consequences of the breaches of the duty to monitor for Total RKA fees, the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable monetary losses.

157. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Company and Board are liable to restore to the Swinerton Plan all losses caused by their failure to adequately monitor individuals on the Plan Committee responsible for Plan Total RKA fees. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representative and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable Total RKA fees, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An Order requiring Swinerton to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Swinerton as necessary to effectuate relief, and to prevent Swinerton's unjust enrichment;

F. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H. An award of pre-judgment interest;

I. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J. Such other and further relief as the Court deems equitable and just.

Date:   October 29, 2024                                 Respectfully submitted,

**WALCHESKE & LUZI, LLC**

*/s/ Paul M. Secunda*
Paul M. Secunda*
* *admitted pro hac vice*
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

**SCHNEIDER WALLCE**
**COTTRELL KONECKY LLP**

James A. Bloom
Todd M. Schneider
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Email: jbloom@schneiderwallace.com
Email: tschneider@schneiderwallace.com

*Attorneys for Plaintiffs and Proposed Class*